**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                         **Plaintiff,**<br><br>     **v.**<br><br>STEVEN D. TARGUM,<br>ELLIOT P. TARGUM,<br>NICHOLAS J. ROSENBERG,<br><br>                     **Defendants.** | Civil Action No. 24-CV- |

**COMPLAINT**

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Steven D. Targum ("S. Targum"), Elliot P. Targum ("E. Targum") and Nicholas J. Rosenberg ("Rosenberg," and collectively, "Defendants"):

**SUMMARY**

1.      This is an insider trading action. Defendants traded in the securities of Frequency Therapeutics, Inc. ("Frequency"), a biotechnology company whose stock is publicly traded, in advance of Frequency's public announcement on February 13, 2023 that the clinical trial for its lead product candidate, a drug intended to treat hearing loss, had failed to achieve its primary efficacy endpoint (the "Announcement").

2.      S. Targum, a consultant to Frequency who was subject to a confidentiality agreement with the company, obtained material nonpublic information about the clinical trial's disappointing results via emails sent on or about February 4, 2023. On the next business day, February 6, 2023, S. Targum sold all of his Frequency stock, a total of 25,000 shares.

3.      S. Targum then tipped this material nonpublic information to his son, E. Targum,

who sold about half of the Frequency shares that he owned, or 2,400 shares. E. Targum's sales also took place on the morning of February 6, 2023. E. Targum placed his order to sell Frequency shares about six minutes after ending a phone call with S. Targum.

4.      E. Targum then tipped this material nonpublic information to his close friend Rosenberg. Less than a minute after entering the order to sell about half of his Frequency shares, E. Targum called Rosenberg. Shortly after that call ended, Rosenberg sold all of the Frequency shares he held in his individual account. Rosenberg sold all of his remaining Frequency shares on February 8, 2023. In total, over those two days, Rosenberg sold about 5,000 Frequency shares.

5.      On the day of the Announcement, Frequency's shares fell 80.6%, from a closing price of $3.93 per share on Friday, February 10, 2023 to a closing price of $0.76 per share on Monday, February 13, 2023. S. Targum, E. Targum and Rosenberg avoided losses of $86,750, $8,376, and $15,323 respectively, on their unlawful Frequency trades.

6.      By trading on the confidential and nonpublic information that Frequency's clinical trial results were negative, S. Targum, E. Targum and Rosenberg reaped an unfair advantage over other investors in the public markets. They avoided losses that other investors experienced when the price of Frequency's shares fell dramatically after the Announcement.

7.      As a result of the conduct alleged herein, S. Targum, E. Targum and Rosenberg violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5].

8.      The Commission seeks permanent injunctions against S. Targum, E. Targum, and Rosenberg, enjoining them from engaging in the transactions, acts, practices, and courses of

business of the type alleged in this Complaint, disgorgement of ill-gotten losses avoided from the unlawful conduct set forth in this Complaint pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)], together with prejudgment interest, civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1], orders barring them from serving as officers or directors of certain public companies, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(e), and 27 of the Exchange Act [15 U.S.C §§78u(d)(1), 78u(e) and 78aa].

10.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C §78aa].  Defendants reside in the District of Massachusetts.  Also, certain of the acts, practices, transactions and courses of business constituting the violations alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly, or indirectly, by making use of the means or instrumentalities of transportations or communication in interstate commerce, or the mails, including the internet and the telephone.

## DEFENDANTS

11.     Steven Targum, age 75, resides in Boston, Massachusetts.  He was engaged by Frequency as a consultant on its clinical trial design from February 2021 until approximately February 2023.  S. Targum has served as a consultant, Chief Medical Officer, Chief Medical Advisor/Medical Director, or Scientific Director at numerous public and private pharmaceutical and biotechnology companies and medical institutions.  He has held medical licenses in several states, but all are currently inactive.

12.     Elliot Targum, age 46, resides in Arlington, Massachusetts and is the son of S.

3

Targum.  E. Targum is currently the Chief Operating Officer of a privately-held insurance brokerage firm.

13.     Nicholas Rosenberg, age 49, resides in Arlington, Massachusetts.  Rosenberg is a licensed attorney who practices as a partner in a private law firm.  Rosenberg and his spouse are close friends and neighbors of E. Targum and his spouse.

## RELATED ENTITY

14.     Frequency Therapeutics, Inc. was a Delaware corporation with a principal place of business in Lexington, Massachusetts before its merger with Korro Bio, Inc. on November 3, 2023.  During the relevant period, Frequency's securities were registered pursuant to Section 12(b) of the Exchange Act and traded on the Nasdaq Global Select Market under the ticker symbol FREQ.  Frequency was a biotechnology company that focused on developing therapeutics that would restore various human biological functions through the activation of progenitor cells.

## FACTUAL ALLEGATIONS

### S. Targum's Relationship with Frequency

15.     In 2022 and early 2023, Frequency's lead product candidate was a drug known as FX-322, which was developed to treat the most prevalent type of hearing loss by treating the loss of hair cells in the ear.

16.     In June 2021, Frequency announced final results from the Phase 2a clinical trial of FX-322.  The trial failed to establish that the drug produced hearing improvements in the patients studied as compared to the placebo.  Frequency attributed the results of this study, in part, to uncontrolled bias and a flawed study design because the placebo group showed unexpected positive results in their hearing scores.  Frequency decided to conduct a Phase 2b clinical trial of

FX-322 with a study design that would eliminate the placebo-related issues that it believed negatively impacted the results of this Phase 2a trial.

17.     In February 2021, Frequency hired S. Targum to consult on its clinical trials, including the Phase 2b clinical trial of FX-322.  S. Targum worked in the field of clinical trial design and had specific experience in the area of eliminating problems in clinical trials that arise from the placebo effect.  The term of the Consulting Agreement was the later of (i) one year, or (ii) until completion of the last Project Assignment, which was defined as "supporting Frequency as a clinical trial consultant in data analysis and trial design issues."  The Consulting Agreement was still in force in February 2023.

18.     By signing the Consulting Agreement, S. Targum acknowledged that in the course of his performance as a Consultant, (i) he may receive confidential information, including clinical data and related derivatives, enhancements, or improvements of clinical data, and (ii) that he was obligated not to use or disclose such confidential information.  He also acknowledged that he was "aware that . . . U.S. and state securities laws and regulations prohibit any person or entity who or that has received material, nonpublic information from purchasing or selling securities of an issuer or from communicating such information to any other person or entity under circumstances in which it is reasonably foreseeable that such person or entity is likely to purchase or sell such securities."

19.     Further, when S. Targum was provided access to the nonpublic clinical trial data for the Phase 2a clinical trial of FX-322, Frequency's General Counsel informed him in an email message of his legal obligations to protect that "extremely sensitive and confidential" data. Targum responded in email that he understood the General Counsel's warnings that the clinical trial data was "material, non-public information under Frequency's Insider Trading Compliance

Policy and U.S. securities laws" and that the consequences "would be severe" were someone "to trade or cause others to trade on the basis of this information" before its public release.

20.    Frequency began dosing patients in the Phase 2b study in October 2021, and publicly announced, by early November 2022, that it expected to release data from the study in the first quarter of 2023.

**S. Targum Learned that the Phase 2b Trial Results Were "Not What People Had Hoped" and Sold All of His Frequency Shares.**

21.    On Saturday, February 4, 2023 at about 4 pm, the CEO of Frequency emailed S. Targum, copying Frequency's General Counsel and stating "[t]he team and I would be appreciative if you could take a few minutes tomorrow (I know. . .) to connect."  The CEO's email did not otherwise indicate the reason for wanting to speak with S. Targum over the weekend on a Sunday.

22.    About two hours later, Frequency's Chief Medical Officer emailed S. Targum with the subject line of the email reading "Trial results."  The body of the email said, in pertinent part, "The results of the Phase 2b hearing study have come in.  Not what people had hoped I think.  Might you have any time on Monday to join in the discussions?  Afternoon?"

23.    S. Targum knew that the information in the email message from Frequency's Chief Medical Officer about Frequency's negative clinical trial results was nonpublic and highly confidential.

24.    S. Targum responded to the CEO's email at about 6 pm on February 5 and indicated he was free on Monday to speak.  S. Targum and the CEO agreed to speak at 9 am on Monday, February 6.

25.    Shortly after 9 am on February 6, S. Targum received an email from Frequency's CEO stating that their planned 9 am call would need to be rescheduled.  At 9:10 am, S. Targum

responded "ok."

26.    About one hour after his February 6 email exchange with Frequency's CEO, S. Targum called his financial adviser, C.S., and directed C.S. to sell all of S. Targum's Frequency shares.  During that call, C.S. reminded S. Targum that he could not trade if he had material nonpublic information about Frequency.  When interviewed, C.S. informed the Commission's staff that he got the impression from his call with S. Targum that S. Targum had not communicated with Frequency recently.

27.    C.S. executed S. Targum's order to sell all of his Frequency shares and accordingly, S. Targum sold all 25,000 shares of Frequency he owned at a price per share of $4.23, for total proceeds of $105,750.

28.    As a Frequency consultant, S. Targum owed Frequency a duty to protect the confidentiality of the highly sensitive and nonpublic information it gave to him about the results of the Phase 2b clinical trial of FX-322.  S. Targum breached that duty both by trading on that information to sell Frequency shares in his own accounts and, as described below, by providing that material nonpublic information to his son E. Targum with the expectation of providing him with a financial benefit.

**S. Targum Tipped E. Targum About Frequency's Negative Trial Results and E. Targum Sold Half of His Frequency Shares.**

29.    On February 6, 2023, S. Targum knew that E. Targum owned shares of Frequency.  S. Targum was the person who had introduced E. Targum to Frequency stock in the first place at or near the time he began working as a Frequency consultant.  E. Targum purchased Frequency shares because he thought that S. Targum's work on Frequency's clinical trial design would help the drug succeed.

30.    On February 6, about one minute after responding to the Frequency CEO's email

cancelling their meeting, S. Targum called E. Targum and they spoke for 8 minutes and 40 seconds.  That call ended at about 9:20 am.

31.    About one minute after ending the call with his father, at 9:21 am, E. Targum logged onto the online system for the brokerage account in which he held his Frequency stock. Also, at 9:21 am, E. Targum placed a call to his friend Rosenberg, which call lasted 23 seconds. During an investigation into the Defendants' trading activities, the Commission subpoenaed E. Targum to give testimony under oath.  During his testimony on August 31, 2023, E. Targum testified that he believes that he did not speak to Rosenberg during the 9:21 am call, but rather left a message.

32.    E. Targum remained logged into his brokerage account's online platform for about 37 minutes that morning, until 9:58 am.

33.    E. Targum tried calling his father at 9:25 am but they did not connect by phone. They then exchanged a text message at 9:25.  S. Targum then called E. Targum at 9:38 am and they spoke for close to 8 minutes, until almost 9:46 am.

34.    During one of the calls between S. Targum and E. Targum on the morning of February 6, S. Targum and E. Targum discussed the fact that the CEO of Frequency had scheduled a call with S. Targum for that morning, and then cancelled the call.

35.    During one of the calls between S. Targum and E. Targum on the morning of February 6, S. Targum conveyed, in substance, to E. Targum the material, nonpublic information that the results of Frequency's Phase 2b clinical trial for FX-322 were negative.

36.    When S. Targum provided information to E. Targum about the negative results of Frequency's clinical trial, S. Targum gave E. Targum an illicit gift of confidential, material nonpublic information that E. Targum could use to avoid losses by selling his Frequency shares

in advance of the public announcement of the clinical trial results.  S. Targum knew or recklessly disregarded that E. Targum would use the information he provided to sell Frequency shares.

37.    When E. Targum received information about Frequency's negative clinical trial results from his father, E. Targum knew or recklessly disregarded that his father had no legitimate business purpose in providing him with that material nonpublic information and that S. Targum was breaching his duty of confidence to Frequency by sharing that information with him.

38.    After hanging up from the phone call with his father, E. Targum made several changes to the order he had entered on his online brokerage platform.  At 9:52 am, about 6 minutes of ending the call with his father, E. Targum submitted the order to his brokerage firm to sell about half of the Frequency shares he owned.

39.    E. Targum's brokerage firm executed his order that day and E. Targum sold 2,400 shares of Frequency at a price per share of $4.25, for total proceeds of $10,200.  E. Targum retained 2,365 shares of Frequency stock and did not sell them in February 2023.

**E. Targum Tipped Rosenberg About Frequency's Negative Trial Results and Rosenberg Sold All of His Frequency Shares.**

40.    During his testimony under oath to the Commission on August 31, 2023, E. Targum described Rosenberg as a "close" friend.  They have known each other since about 2006, they live on the same street, their wives and families are friends, and at the time of the events described in this complaint, they saw each other about every other week.  They are sufficiently close that Rosenberg came over in the middle of the night to watch E. Targum's child when E. Targum and his spouse needed to leave the house.

41.    As a business lawyer, Rosenberg understood the law surrounding insider trading. In fact, at the time when E. Targum and Rosenberg discussed E. Targum's purchase of

9

Frequency stock, Rosenberg asked E. Targum whether he was engaged in "insider trading" by making an investment in Frequency stock when E. Targum's father was working on the design of Frequency's second clinical trial. E. Targum assured Rosenberg that his purchase was not insider trading because he claimed S. Targum would not know the results of the drug's efficacy until that information was public. This conversation shows that both E. Targum and Rosenberg understood that if they or S. Targum became aware of the results of the clinical trial, or information about the drug's efficacy, before the public did, they would be violating the law if they traded on that information.

42. At 9:52 am on the morning of February 6, about 6 minutes after ending an 8-minute call with his father, and within one minute of placing the order to sell his Frequency shares, E. Targum called his friend Rosenberg. Their call lasted just three to four minutes and ended at about 9:56.

43. E. Targum called Rosenberg that morning in order to tell him that he was selling some of his Frequency shares. At some prior date, E. Targum had told Rosenberg: about his purchases of Frequency shares, about his father's work for Frequency, and that he would tell Rosenberg when or if he was going to transact again in Frequency shares. At the time of their call on February 6, 2023, E. Targum knew that Rosenberg also owned Frequency shares.

44. During their call on the morning of February 6, E. Targum told Rosenberg that his father was supposed to speak with someone at Frequency. At the time of the call, Rosenberg knew that S. Targum had worked as a consultant to Frequency.

45. The information E. Targum conveyed to Rosenberg during their call that morning constituted negative material nonpublic information about Frequency that caused Rosenberg to sell his shares.

46.     When E. Targum provided negative information to Rosenberg about Frequency, E. Targum gave Rosenberg an illicit gift of confidential, material nonpublic information that Rosenberg could use to avoid losses by selling his Frequency shares in advance of the public announcement of the clinical trial results.  E. Targum gave Rosenberg this information with the expectation of providing a benefit to Rosenberg.

47.     When Rosenberg received negative information about Frequency from E. Targum, Rosenberg knew or recklessly disregarded that E. Targum had no legitimate business purpose in providing him with that material nonpublic information and that the information must have come from S. Targum, who had breached his duty of confidence to Frequency by sharing that information with E. Targum.

48.     At 10 am, about four minutes after ending his call with E. Targum, Rosenberg logged onto the online system for the brokerage account in which he held his Frequency stock. Over the next two hours, Rosenberg accessed various types of information about his accounts and the market that were available through that online platform, and then submitted an order to sell Frequency shares in one of his accounts at 12:06 pm.

49.      Rosenberg's brokerage firm executed his order that day and he sold all 888 shares of Frequency that he owned in his individual brokerage account at an average price per share of $4.217, for total proceeds of $3,744.95.

50.     Two days later, on February 8, 2024, Rosenberg sold all of his remaining Frequency shares.  That morning, he logged onto the online system for the brokerage account in which he held his remaining Frequency shares, and at about 11 am, submitted an order to sell his remaining Frequency shares.  The brokerage firm executed his order that day and Rosenberg sold the remaining 4,098 shares of Frequency that he owned in his joint brokerage account at an

average price per share of $3.75, for total proceeds of $15,367.15.

**Frequency's Clinical Trial Results Became Public and Its Stock Price Dropped by About 80%.**

51.    About one week after the Defendants' sales of their Frequency shares, Frequency announced publicly the results of the Phase 2b clinical trial of FX-322.

52.    On February 13, 2023, before the markets opened, Frequency published a press release stating that the FX-322 study failed to meet its primary endpoint such that there was no significant difference in speech perception between patients who had been given the FX-322 drug and the placebo.  The company also announced that it would discontinue its FX-322 development program in light of these study results and would also discontinue the ongoing clinical trial of another potential product for treating hearing loss.  Frequency stated that it would immediately reduce its headcount, undergo a restructuring, and change its focus to work on another product candidate to treat multiple sclerosis.

53.    Frequency's announcement of the FX-322 clinical trial results and the related changes in its business caused Frequency's stock price to drop by about 80% compared to the prior day's closing price.

54.    By selling their shares on the basis of advance, nonpublic information about the negative results of Frequency's FX-322 clinical trial, Defendants unjustly avoided losses that other investors in the market suffered when Frequency's clinical trial results became public.

**FIRST CLAIM FOR RELIEF**
**<u>FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES</u>**
**(Defendants' Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

55.    Paragraphs 1 through 54 above are re-alleged and incorporated by reference as if fully set forth herein.

56.    During the Relevant Period, the stock of Frequency was a security under Section

3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)].

57.     By reason of the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

58.     Defendants' conduct involved fraud, deceit, manipulation or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in substantial losses to other persons.

59.     By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R §240.10b-5] thereunder.

### **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.     Permanently restrain Defendants, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal services or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§78i(a), 78j(b)], and Rule 10b-5 thereunder [17 C.F.R §240.10b-5] by (i) buying or selling a security of any issuer, on the basis of material nonpublic information, in breach of a fiduciary duty or other duty of trust or confidence that is owed

directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the information; or (ii) by communicating material nonpublic information about a security or issuer, in breach of a fiduciary duty or other duty of trust or confidence, to another person or persons for purposes of buying or selling any security;

B.    Order Defendants to disgorge, with prejudgment interest, all ill-gotten losses avoided that were obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)];

C.    Order Defendants each to pay an appropriate civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1];

D.    Enter orders barring Defendants S. Targum and E. Targum from serving as officers or directors of certain public companies, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)];

E.    Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.    Grant such other further relief as the Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED: August 8, 2024

Respectfully submitted,

/s/ Kathleen Burdette Shields
Kathleen Burdette Shields (Mass Bar No. 637438)
Dawn Edick (Mass Bar No. 641659)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
Phone: (617) 573-8904 (Shields direct)

14

(617) 573-8940 (Edick direct)
(617) 573-4590 (fax)
ShieldsKa@sec.gov (Shields email)
EdickD@sec.gov (Edick email)